Abraham J. Gordon and Ruth F. Gordon v. Commissioner.
Gordon v. Commissioner
Docket No. 62003.
United States Tax Court
T.C. Memo 1958-168; 1958 Tax Ct. Memo LEXIS 56; 17 T.C.M. (CCH) 842; T.C.M. (RIA) 58168; September 16, 1958
*56 Aaron Finger, Esq., and Louis J. Finger, Esq., du Pont Building, Wilmington, Del., for the petitioners. Paul D. Ritter, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined a deficiency of $205 in the income tax of the petitioners for 1952. The only issue for determination is the correctness of the respondent's disallowance of a deduction of $22,097.72 taken by petitioners as a loss sustained by petitioner Abraham J. Gordon in the conduct of a sole proprietorship business. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners are and during 1952 were husband and wife residing in Wilmington, Delaware. They filed their joint individual income tax return for 1952 with the collector for the district of Delaware. Counsel for the petitioners, Aaron Finger and Louis J. Finger, are father and son, respectively. Petitioner Ruth F. Gordon is the daughter of Aaron Finger and Anna E. Finger. Prior to 1951 Abraham J. Gordon, hereinafter referred to as the petitioner, lived in New York where he owned a printing plant and also had engaged in the sale of plastic *57 products. About 1950 a Dr. Bornstein, a chemical engineer in Wilmington, Delaware, originated a process for the manufacture of plastic compounds, designated urea formaldehyde molding compounds, by the use of urea and paraformaldehyde as basic materials. The Bornstein process was a radically different method of manufacture from the conventional method then in use for the manufacture of such compounds. The Bornstein process was supposed to obviate the need for certain expensive items of equipment used in manufacturing by the conventional method. Accordingly, manufacturing costs under the process were supposed to be far below those under the conventional method. The petitioner became interested in the Bornstein process and although he found that it had not been employed in manufacturing molding compounds on a commercial basis, he did find that it had been successfully used in their manufacture on a laboratory basis, and that some of the compounds produced on a laboratory basis had been submitted to potential customers who approved them as being satisfactory products for commercial purposes. Further investigation by petitioner of the possibilities of profitably manufacturing under the *58 Bornstein process and selling the products disclosed that newly designed and untried machinery would be required, that basic materials used under the process were scarce and that competition from various established manufacturers would be encountered. However, such investigation also disclosed that the demand for molding compounds was so great that potential competitors were rationing their production among their customers and that customers were having to wait from 12 to 16 weeks before getting deliveries of the amounts of compounds allotted to them. On the basis of his investigation the petitioner in the first part of 1951 concluded that the manufacture of the molding compounds under the Bornstein process and their sale could be carried on profitably by him. Since all of his previous business enterprises had been conducted as sole proprietorships, he at first considered conducting the manufacture of the molding compounds and the sale of them as a single sole proprietorship business. However, after conferring with friends and upon the advice of his counsel, the petitioner decided that, in view of the hazardous nature of the new business and the risks involved, he would cause a corporation *59 to be formed to manufacture the compounds and that he, as a sole proprietor, would purchase from the corporation and sell all the compounds manufactured by the corporation. In furtherance of his decision the petitioner conferred with Aaron Finger respecting land and a building for use in the manufacture of the compounds. Eventually it was decided that the manufacture of the compounds would be conducted in a building to be constructed on land in which Aaron Finger then owned a one-half interest and in which he subsequently acquired the remaining one-half interest. After becoming the owner of the entire interest in the land Aaron Finger transferred it to a trust of which Louis J. Finger was trustee and of which petitioner's mother and a brother were beneficiaries and Louis J. Finger and Ruth F. Gordon, petitioner's wife, were the remainder beneficiaries. Petitioner participated in the preparation of the plans for the construction of the building which was erected on the land and he and an engineer decided upon the equipment which was installed in the building for manufacturing the compounds. The petitioner estimated that $35,000 or $40,000 would be required to obtain equipment for *60 the manufacture of the compounds and begin their production. His entire resources amounted to $20,000 which he intended to invest in the corporation. He anticipated borrowing the remainder of the amount which he estimated would be required. On April 26, 1951, Gordon Chemicals, Inc., sometimes hereinafter referred to as the corporation, was incorporated under the laws of the State of Delaware to engage in the manufacture of urea formaldehyde molding compounds. The first meeting of the corporation's board of directors, consisting of Aaron Finger, Anna E. Finger and Ruth F. Gordon was held on April 28, 1951, in the residence of Aaron Finger. At that meeting officers of the corporation were elected as follows: President
Aaron Finger
Vice-president
Anna E. Finger
Secretary
Ruth F. Gordon
Treasurer
Ruth F. Gordon
At the meeting the board of directors accepted the offer of petitioner to purchase the capital stock of the corporation, authorized the corporation's vice-president and secretary to execute a draft of a contract proposed by petitioner wherein petitioner agreed, among other things, to purchase from the corporation its entire output of products, authorized *61 the execution by the corporation's officers of a lease to the corporation of the building heretofore referred to, and ratified and approved the prior action of the corporation's officers in placing orders for equipment to be installed in the corporation's plant. At this point in the meeting Aaron Finger resigned as a director and president of the corporation and in his stead the petitioner was elected as a director and president of the corporation. Whereupon the petitioner assumed his duties, following which the directors adopted a resolution respecting the opening of a bank account for the corporation and providing for the payment of funds therefrom upon checks signed by petitioner as president or Ruth F. Gordon as treasurer. The directors adopted a further resolution authorizing the corporation to borrow funds for corporate purposes in such amounts as should be determined by the president either from any individual or bank or lending institution, evidencing and securing any such loan or loans by such instruments and in such manner as should be approved by the president. At the time of the meeting of the corporation's board of directors and pursuant to authorization granted thereat, *62 Anna E. Finger and Ruth F. Gordon as vice-president and as secretary, respectively, of the corporation, executed with the petitioner an agreement which provided as follows: "This Agreement made this twenty-eighth day of April, 1951, between Gordon Chemicals, Inc., a corporation of the State of Delaware, party of the first part, (hereinafter referred to as the 'corporation'), and Abraham J. Gordon, using the firm name Gordon Chemical Co., party of the second part (hereinafter referred to as 'Gordon'), "Witnesseth: "Recitals "The Corporation has been organized primarily as a manufacturing company. It does not have the resources for the adequate marketing of its products. Gordon is willing to undertake, at his own expense, to get the Corporation's products on the market, and to create such organization therefor as he deems necessary, including giving his own time and efforts to enable the Corporation's output to be sold, to which end the parties have agreed to enter into the arrangements hereinafter set forth. "Covenants "Now, Therefore, the parties hereto, in consideration of their mutual promises and agreements, hereby agree as follows: "(1) The corporation agrees to *63 sell its output exclusively to Gordon, according to orders to be placed by Gordon from time to time. Gordon shall give to the Corporation reasonable advance notice of the quantities and kinds of products manufactured by the Corporation that Gordon desires, and the Corporation agrees to use its best efforts, within the limits of its productive capacity, to provide the quantity and kind of product so called for, from time to time, by Gordon. "(2) Gordon agrees, at his own expense, to give his best efforts toward creating a market for the Corporation's products and to obtain purchasers for the Corporation's product to the extent of the Corporation's productive capacity. "(3) The price to be paid by Gordon for his purchases from the Corporation shall be a sum equivalent to One Hundred Seven per cent (107%) of the Corporation's cost thereof, computed as follows, viz.: - costs to be computed under this agreement in accordance with generally accepted principles of accounting, but no item shall be included in costs for general and administrative expenses, selling expenses, depreciation, taxes based upon income or corporate franchise, capital stock or other analogous taxes, excepting, however, *64 that real estate taxes and unemployment and social security taxes shall be included in costs. The Corporation shall submit statements of accounts regularly to Gordon for sales hereunder, estimating as nearly as may be the amounts payable in respect to current sales, and Gordon shall make payment on or before the fifteenth day of each month for all purchases by him during the preceding month. Within, three months after the end of each calendar year the exact amount payable by Gordon in respect of purchases during the preceding year shall be computed as nearly as may be and any deficiency in the amount payable by Gordon as thus computed shall be paid by him to the Corporation, or if any over-payment shall thus have been ascertained, the amount of such over-payment shall be refunded or credited. "(4) The Corporation agrees that it will, in good faith, endeavor to keep its plant operating and in position to produce product in the quantities and of the kinds and qualities called for by Gordon, but the obligation of the Corporation hereunder shall be subject to and contingent upon strikes, riot, war, fire, explosion, accident, failure or curtailment in the Corporation's supply of materials, *65 delays of carriers and/or delays and contingencies beyond the Corporation's control. Gordon agrees to use his best efforts to obtain business to the extent of the Corporation's productive capacity and not to buy from others products of the kind produced by the Corporation except when the Corporation is not in position to fill Gordon's orders. Gordon also agrees to give supervisory service to the Corporation in respect to its manufacturing operations to such extent as Gordon may find it feasible or desirable, without compensation from the Corporation to him. "(5) This contract shall be effective as of July 1, 1951, and shall continue in force for a period of one year, and thereafter shall continue in force until either party shall give thirty (30) days' notice to the other of its or his intention and desire to terminate this agreement." * * *
Although the petitioner was to pay the corporation an agreed 107 per cent of its cost to manufacture the products he purchased from it, it was contemplated that he would sell such products to his customers at the prevailing trade price. Subsequently in 1951 the petitioner paid into the corporation $20,000 for its capital stock and thereafter *66 during 1951 and continuing throughout 1952 he was the owner of all the corporation's capital stock. Due to difficulties presented in the manufacture of certain portions of the equipment which had been ordered for the corporation there was an interval of several months between formation of the corporation and the corporation's receipt and installation of the equipment and the beginning of business. During the delay the corporation had an opportunity to stockpile urea and paraformaldehyde, basic materials that would be used in its manufacturing business and which were in short supply. To finance the put hase of these materials the petitioner borrowed money and loaned it to the corporation with the expectation that shortly after the corporation began manufacturing operations it would repay the money. Following the installation of the equipment and upon beginning manufacturing operations, the corporation experienced considerable delay and expense in endeavoring to make the proposed new manufacturing method work and eventually the method was abandoned. All this required substantial amounts of funds in excess of what had been expected originally. Subsequent to 1952, the corporation's *67 equipment had to be replaced. The cost to the corporation of its machinery and equipment as shown by its books at the close of December 31, 1952, was, before depreciation, $68,751.87. From the time the corporation began business and throughout 1952, it functioned solely as a manufacturing corporation, in accordance with the plan pursuant to which it was organized. During that period Gordon Chemical Company, of which petitioner was the sole proprietor, and sometimes hereinafter referred to as the proprietorship, functioned in accordance with the above-mentioned agreement of April 28, 1951, between the corporation and the petitioner. During the period September 24, 1951, through December 31, 1952, the petitioner borrowed from the following persons the indicated amounts and loaned those amounts to the corporation: Aaron Finger
$20,500
Anna E. Finger
12,500
Ruth F. Gordon
41,000
Elizabeth Gordon
15,000
Total
$89,000 In addition to the foregoing the petitioner loaned to the corporation $3,000 from his personal funds which he had accumulated since the formation of the corporation, thus making total loans of $92,000 by petitioner to the corporation through December *68 1952. The books of the corporation at the end of 1952 show the above-mentioned loans by petitioner to the corporation totaling $92,000 as loans payable by the corporation to the proprietorship. The books of the proprietorship at the end of 1952 show the loans totaling $92,000 as loans receivable by the proprietorship from the corporation. The books of the proprietorship at the end of 1952 also show the loans made to petitioner by Aaron and Anna E. Finger, Ruth F. Gordon and Elizabeth Gordon totaling $89,000 as loans payable by the proprietorship to those respective persons. During 1952 the corporation was engaged in the manufacture of molding compounds which it sold directly to the proprietorship. The corporation books show that during the period August 1 to December 3, 1952, the corporation debited the proprietorship with 15 items of sales totaling $9,969.25, against which it was credited with 4 items totaling $2,219.95 (for material returned, freight on material returned and other unexplained * items), leaving net sales of $7,749.30 debited to the proprietorship. In December 1952, the proprietorship was debited with an additional amount of $21,720.93 which was explained on the *69 corporation's books as follows: "This adj. to bring sales in line with contract." The foregoing amounts of $7,749.30 and $21,720.93 total $29,470.23, or the net total amount debited to the proprietorship on the books of the corporation on account of the proprietorship's purchases of products from the corporation during 1952. The purchases account in the books of the proprietorship shows purchases totaling $7,749.30 from the corporation prior to December 7, 1952, and also shows under date of December 7, 1952, an additional amount of $21,720.93, making a total of $29,470.23 shown for the year in the account. During 1952 the proprietorship, out of proceeds it received from the sale of products it had purchased from the corporation, paid the corporation "approximately $3,000" for products it purchased from the corporation in 1952. The books of the corporation at the close of December 31, 1952, show as an account receivable an indebtedness of $25,904.23 owing to the corporation by the proprietorship. The books of the proprietorship at the close of December 31, 1952, show as an account payable an indebtedness of $25,904.23 owing by the proprietorship to the corporation. *70 The books of the proprietorship show the proprietorship as having sold for $7,749.30 its net purchases from the corporation for which the corporation debited it with the net amount of $7,749.30. Respecting its net sales of $7,749.30 the proprietorship allowed discounts to its customers which reduced the $7,749.30 to $7,677.85. The receipts by the proprietorship during 1952 from the sale of molding compounds purchased from the corporation were $7,677.85. The proprietorship's selling expenses for the year were $305.34. In their income tax return for 1952 the petitioners deducted $22,097.72 as a loss sustained in that year by petitioner Abraham J. Gordon on the sale in the proprietorship business of products purchased by him from the corporation. The respondent disallowed the deduction. Opinion Taking the position that the record shows that the proprietorship's receipts during 1952 from the sale of products purchased from the corporation were $7,677.85 and that the cost to the proprietorship of such products and its expenses in selling the products were $29,470.23 and $305.34, respectively, or a total of $29,775.57, the petitioners contend that the proprietorship sustained a loss *71 in the amount of $22,097.72 which was properly deductible in their income tax return for 1952. The respondent contends that petitioners have not only failed to establish that the proprietorship sustained a loss of $22,097.72 as claimed by them in their return but that they have failed to show that the proprietorship sustained any loss during 1952. Deductions are a matter of legislative grace and one who seeks a deduction must bring himself clearly within the terms of the statute granting the deduction. ; . Where a taxpayer seeks a deduction, the burden is upon him to prove not only that he is entitled to it but also the amount of it. . The impossibility of proving the material facts upon which the claim rests does not relieve the taxpayer of his burden of proof. . Although the Bornstein process for manufacturing molding compounds was an untried and unproven process from a commercial standpoint, the petitioner in the first part of 1951 concluded that the manufacture *72 of molding compounds by the process and the sale of manufactured products could be carried on profitably by him. Because of the hazards and risks connected with manufacturing under the process and upon advice of counsel, he caused a corporation, of which he became sole stockholder and president and a director, to be organized for manufacturing purposes. After the formation of the corporation he and the corporation entered into the agreement of April 28, 1951, whereby the corporation agreed "to sell its output exclusively" to him "according to orders to be placed" by him from time to time. The agreement provided that "The price to be paid by Gordon [petitioner] for his purchases from the Corporation shall be a sum equivalent to One Hundred Seven per cent (107%) of the Corporation's cost thereof," computed according to certain provisions set forth in the agreement. The corporation experienced considerable delay and expense in attempting to make the proposed new manufacturing method work but the method proved to be so unsatisfactory that eventually it was abandoned and the equipment originally installed by the corporation was replaced. During the first half of 1952 and into the fall *73 of that year the corporation produced substantial quantities of molding compounds which were so defective that they were not salable. During 1952 net debits by the corporation to the proprietorship for products sold by the corporation to the proprietorship in that year amounted to $7,749.30. The only payment made in 1952 to the corporation by the proprietorship for such products was a payment of "approximately $3,000." This would leave a balance of approximately $4,749.30 owing by the proprietorship for such products. When, if ever, that balance was paid by the proprietorship is not disclosed by the record. In this connection it is observed that the proprietorship sold to its customers the products purchased from the corporation debited the proprietorship for such products. Presumably this was the prevailing trade price to consumers of such products. In addition to debiting the proprietorship with $7,749.30 for net sales of products to it during 1952, the corporation by an entry made in December 1952 debited the proprietorship with an additional amount of $21,720.93 with the explanation on the corporation's books that "This adj. to bring sales in line with contract," apparently *74 referring to the agreement of April 28, 1951. The entry was made by Henry Redmile, "a Dupont employee," who kept the corporation's books and the proprietorship's books "in his spare time evenings and on weekends." The petitioner testified that he had no knowledge of bookkeeping and that, when Redmile was first employed, he showed Redmile the agreement of April 28, 1951, and instructed him to keep the records of the corporation and the records of the proprietorship in accordance with the agreement and that this constituted his only instructions to Redmile about the bookkeeping. Redmile was not offered as a witness and we are not otherwise informed by the record as to how he computed the amount of $21,720.93 or any portion of it or why he determined that it was chargeable to the proprietorship on account of the corporation's sales to it. So far as we can determine from the record, the corporation in debiting the proprietorship for net sales of $7,749.30 debited it with all of the corporation's expenses properly to be included in determining the corporation's cost of such sales under the agreement of April 28, 1951. Furthermore, there is nothing in the record to show that the $21,720.93 *75 was paid by the proprietorship in 1952 or in any later year. In connection with the foregoing it is observed that the corporation's 1952 return was placed in evidence. The return was prepared by Redmile and was executed by petitioner. A net loss of $17,465.78 was reported on the return. The corporation's gross sales are shown on the return as $33,769.13, returns and allowances as $2,187.25 and net sales as $31,581.88. The latter amount is $2,111.65 in excess of the total amount of $29,470.23 with which the corporation debited the proprietorship on account of the latter's purchases from the corporation. This would indicate that the corporation made sales to another or others than the proprietorship. But the petitioner testified that the proprietorship was the corporation's only customer. This apparent conflict is not reconcilable from the record. The corporation's income tax return for 1952 contains the statement that it was prepared on the cash basis. In the return a deduction of $10,800 was taken for rent. The petitioner testified that if the corporation paid any rent in 1952 it was a minor sum. Louis J. Finger, who as trustee held the premises on which the corporation conducted *76 its manufacturing activities, testified that if the corporation paid any rent in 1952 the sum was very small and did not amount to $10,000. This obvious conflict is accentuated by the corporation's balance sheets constituting part of its 1952 income tax return. The balance sheet at the beginning of 1952 shows as a liability "Accrued Rent" in the amount of $38,754.80. The balance sheet at the end of the year shows "Accrued Rent" in the amount of $14,400. Normally the foregoing would indicate that during 1952 the corporation had paid rent in at least the amount of the difference between those two amounts, or $24,354.80. The testimony of the petitioner as to the proprietorship being the corporation's only customer, and petitioner's and Louis J. Finger's testimony as to the corporation's payment of rent in 1952, when considered in connection with what appears in the corporation's return, raise considerable doubt as to Redmile's competency as a bookkeeper and as to the accuracy of the corporation's and the proprietorship's books which he kept. The record is silent as to the basis on which the petitioners' income tax return for 1952, which also was prepared by Redmile, was prepared. If *77 for purposes of discussion it be conceded that the return was prepared on the accrual basis, then we are unable to find that the proprietorship was chargeable with any greater amount than $7,749.30, representing the amount of net sales with which the corporation debited the proprietorship during the period August 1 to December 3, 1952. If, on the other hand, it be conceded that the return was filed on the cash basis, then we are faced with a record which shows that with respect to the foregoing net sales of $7,749.30 made by the corporation to the proprietorship, the latter during 1952 paid only the amount of approximately $3,000. In connection with the foregoing the petitioners point out that the books of both the corporation and the proprietorship at the close of December 31, 1952, show that the corporation was indebted to the proprietorship in the amount of $92,000 and that the proprietorship was indebted to the corporation in the amount of $25,904.23 and ask us to find that in 1952 the petitioner offset the proprietorship debt of $25,904.23 against the corporation's debt of $92,000 and thereby made payment to the corporation in 1952 of the proprietorship debt of $25,904.23. This *78 we are unable to do. Because of the hazards and risks involved in the manufacture of molding compounds under the Bornstein process, the petitioner caused the corporation to be formed in 1951 for that purpose. The record shows that the corporation thereafter and until at least some time in 1957, when the petitioner and others who had become stockholders in the corporation sold their stock in it, engaged in carrying on business. Although during 1952 the petitioner was the sole stockholder of the corporation, he and it were separate and distinct entities. However, since the petitioner was the sole proprietor of the proprietorship, he and the proprietorship were the same entity but an entity separate and distinct from the corporation. The corporation maintained a set of books for itself and the proprietorship maintained a separate set of books for itself. Each carried on separate and distinct business activities. Consequently, in order for us to find that in 1952 there was an offset of a proprietorship indebtedness of $25,904.23 to the corporation against a corporation indebtedness of $92,000 to the proprietorship, we would have to find a substantial basis therefor in the record. Neither *79 the corporation's books nor the proprietorship's books indicate that such an offset was made in 1952. In fact the books of each indicate that the contrary was true. There is no evidence of any action having been taken by the corporation with respect to the matter. Although the petitioner was the sole stockholder and president of the corporation and in full control of the corporation in 1952, there is no evidence that he made an offset or even directed Redmile, who was the bookkeeper for the corporation and also for the proprietorship, to make any entries in any books indicating that such offset had been made or that such offset had been authorized. Consequently, the record does not permit the finding requested by petitioners. In view of what has been said heretofore, we conclude that the petitioners have failed to establish that a loss of $22,097.72, or any other amount, was sustained by petitioner in 1952 in the conduct of the proprietorship business. Accordingly, the respondent's action is sustained. Decision will be entered for the respondent. Footnotes
*. The word "explained" deleted and the word "unexplained" added by an official order of the Tax Court, dated September 22, 1958 and signed by Judge Withey.↩